1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

                        **CV   08        0613**

10

11   *Selene Stewart*    Plaintiff,

12   vs.                              CASE NO. _____

13                                    **EMPLOYMENT DISCRIMINATION**
                                      **COMPLAINT**
14   *Winsor House*    Defendant(s).

15   *Convalescent Hospital*

16   1.    Plaintiff resides at:

17        Address *300 Gooding Way # 343*

18        City, State & Zip Code *Albany Ca 94706*

19        Phone *510-300-7708*

20   2.    Defendant is located at:

21        Address *101 S. Orchard Ave*

22        City, State & Zip Code *Vacaville Ca 95688*

23   3.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employ-

24   ment discrimination.  Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5.

25   Equitable and other relief is sought under 42 U.S.C. Section 2000e-5(g).

26   4.    The acts complained of in this suit concern:

27        a.  ✓ Failure to employ me.

28        b.  ✓ Termination of my employment.

Form-Intake 2 (Rev. 4/05)              - 1 -

1    c. __ Failure to promote me.

2    d. ✓ Other acts as specified below.

3    _LAW SUIT AGAINST ME instead of the_

4    _CAUCASIAN HOSPICE NURSE._

5    _____

6    _____

7    _____

8    _____

9    5.    Defendant's conduct is discriminatory with respect to the following:

10    a. ✓ My race or color.

11    b. __ My religion.

12    c. __ My sex.

13    d. __ My national origin.

14    e. __ Other as specified below.

15    _____

16    6.    The basic facts surrounding my claim of discrimination are:

17    _I had worked for their hospital through_

18    _a registry. PLEASE SEE Attachments –_

19    _PLEASE SEE Attachments 1 – 7_

20    _Instead of defending me the hospital sued_

21    _me with a criss-cross law suit, Now there_

22    _ARE NINE LAW suits ._

23    _____

24    _____

25    7.    The alleged discrimination occurred on or about _4 – 2 – 2007_.

26                            (DATE)

27    8.    I filed charges with the Federal Equal Employment Opportunity Commission (or the

28    California Department of Fair Employment and Housing) regarding defendant's alleged

Form-Intake 2 (Rev. 4/05)                - 2 -

1  discriminatory conduct on or about __4 - 2 - 2007__.

2  (DATE)

3  9.    The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter

4  (copy attached), which was received by me on or about __October 25, 2007__.

5  (DATE)

6  10.   Plaintiff hereby demands a jury for all claims for which a jury is permitted:

7  Yes __✓__   No ____

8  11.   WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,

9  including injunctive orders, damages, costs, and attorney fees.

10

11  DATED: __1-25-08__          _Selene Stewart_

12  SIGNATURE OF PLAINTIFF

13

14  *(PLEASE NOTE: NOTARIZATION*      __Selene Stewart__

15  *IS NOT REQUIRED.)*          PLAINTIFF'S NAME

16  (Printed or Typed)

17

18

19

20

21

22

23

24

25

26

27

28

Form-Intake 2 (Rev. 4/05)          - 3 -

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Ms. Selene Stewart<br>300 Gooding Way  #343<br>Albany, CA 94706 | From: | San Francisco District Office<br>350 The Embarcadero<br>Suite 500<br>San Francisco, CA 94105 |
|-----|-----|-----|-----|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|-----|-----|-----|
| 550-2008-00027 | **Blake C. Wu,**<br>**Investigator** | **(415) 625-5602** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**H. Joan Ehrlich,**
**District Director**

10/25/07
*(Date Mailed)*

cc:     **Director of Human Resources**
**WINDSOR HOUSE CONVALESCENT HOSPITAL**
**101 S. Orchard Ave**
**Vacaville, CA 95688**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*



**U.S. Equal Employment Opportunity Commission**
**San Francisco District Office**

350 The Embarcadero
Suite 500
San Francisco, CA 94105
(415)625-5602
TTY (415) 625-5610
FAX (415) 625-5609
1-800-669-4000
866-408-8075

Respondent:          WINDSOR HOUSE CONVALESCENT HOSPITAL
EEOC Charge No.:    550-2008-00027

October 9, 2007

Ms. Selene Stewart
300 Gooding Way #343
Albany, CA 94706

EEOC Number: 550-2008-00027

Ms. Stewart:

Now that you have filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC), it is important for you to understand some of our case processing procedures.

A copy of your charge will automatically be filed with the State of California, Department of Fair Employment and Housing. This is being done to protect your right to file a suit in state court, should you desire to do so at a later date. It is not necessary for you to contact the state agency. Because of the formal agreement between the EEOC and the state agency, the EEOC will be processing your charge. The state agency will not process it unless we request them to do so. This rarely happens, but, if it does, we will certainly let you know that we are transferring your charge to the state agency for processing.

In the interest of saving both your time and the time of the state agency, please do not contact that office either to file your charge or to inquire regarding it.

A copy of your charge will be served upon the Respondent within the time limitation set forth under both federal and state laws. In this instance, your charge will be served within ten (10) days following receipt of it by this office.

Finally, we suggest that you keep this notice and a copy of your charge for your records. Be sure to advise us of any change in your address or telephone number. Failure to do so could result in dismissal of your charge. Please use your charge number on all correspondence.

If you need further assistance, please contact Terry Knapp at (415) 625-5667.

Sincerely,
*Michelle L. Nardella*
Enforcement Manager

# rMENT OF FAIR EMPLOYMENT & HOUSING

~~JDRESS CHECKED BELOW)~~

, # (800) 700-2320

**Date:** October 9, 2007

**Case Name:** SELENE STEWART vs. WINDSOR HOUSE CONVALESCENT HOSPITAL

**EEOC No:** 550-2008-00027

☐ **H** 1001 Tower Way, Suite 250
Bakersfield, CA 93309
(661) 395-2729

☐ **C** 1320 E. Shaw Avenue, Suite 150
Fresno, CA 93710
(559) 244-4760

☐ **R/S/T** 611 West Sixth Street, Suite 1500
Los Angeles, CA 90017
(213) 439-6799

☐ **M** 1515 Clay Street, Suite 701
Oakland, CA 94612
(510) 622-2941

☐ **E** 2000 "O" Street, Suite 120
Sacramento, CA 95814
(916) 445-6523

☐ **D** 1350 Front Street, Suite 3005
San Diego, CA 92101
(619) 645-2681

☒ **A** San Francisco District Office
1515 Clay Street, Suite 701
Oakland, CA 94612
(510) 622-2973

☐ **G** 2570 North First Street, Suite 480
San Jose, CA 95131
(408) 325-0344

☐ **K** 2101 East Fourth Street, Suite 255-B
Santa Ana, CA 92706
(714) 558-4266

## NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being referred to the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

**No response to the DFEH is required by the respondent.**

The EEOC will be responsible for the processing of this complaint. DFEH will not be conducting an investigation into this matter. EEOC should be contacted directly for any discussion of the charge. DFEH is closing its case on the basis of "processing waived to another agency."

## NOTICE TO COMPLAINANT OF RIGHT-TO-SUE

Since DFEH will not be issuing an accusation, this letter is also your right-to-sue notice. According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior or Justice Court. Government Code section 12965, subdivision (b), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (d)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed. Questions about the right to file under federal law should be referred to the EEOC.

The DFEH does not retain case records beyond three years after a complaint is filed.

**Remember:** This Right-To-Sue Notice allows you to file a private lawsuit in State court.

Sincerely,

WANDA J. KIRBY
Chief Deputy Director

DFEH-200-02 (05/07)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 550-2008-00027 |

### California Department Of Fair Employment & Housing

State or local Agency, if any

and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Stewart, Selene** | **(510) 300-7700** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **300 Gooding Way #343, Albany, CA 94706** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **WINDSOR HOUSE CONVALESCENT HOSPITAL** | **Unknown** | **(707) 448-6458** |

| Street Address | City, State and ZIP Code |
|---|---|
| **101 S. Orchard Ave,  Vacaville, CA 95688** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE    ☐ COLOR    ☐ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN

☒ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                Latest
04-02-2007

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I worked for Respondent in summer of 2006. In early August 2006, I was wrongfully terminated over the death of a patient. Subsequently, the patient's family filed a lawsuit against me and Respondent. I believe Respondent discriminated against me by terminating me but not a Caucasian hospice nurse. In addition, I believe Respondent has retaliated against me by refusing to pay for my legal defense as well as cross-filing against me as a defendant in the lawsuit.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. I further believe Respondent has retaliated against me for engaging in protected activity.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| _10-3-07_    *Selene Stewart* <br> Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

**Case #:**          **Caseworkers: Christina Chiang,  Patrick Loi, Stephanie Cho** #2
**Case intake date/time:** November 9, 12:30 PM
**Follow-up date/time: November 30**

### ASUC Student Legal Clinic
### 300A Eshleman Hall
### (510) 642-9986
### http:///www.ocf.berkeley.edu/~slc

### Case Report

**Name of Client:**
**Case Information: Wrongful death lawsuit/discrimination**
**Disclaimer: X Yes    No**

### Summary of Events

The client is/was an LVN nurse. Now she is an undergraduate at UC Berkeley studying to become a teacher. On July 8, 2006 she worked at a hospital and had 38 patients in one day. One patient was a Hospice patient. He was 64 years old, named Larry "Boogie" Layfield and was a dialysis patient refusing dialysis. Refusing dialysis is like suicide. He refused it twice during the week and had no dialysis for 6 days. Both the patient and his son have an extensive criminal background. On Saturday the patient had refused dialysis, food, water, bathing and everything. The client says that the patient has the right to refuse anything. At 11:30 AM of July 8, 2006 the family went into the hospital to visit the patient. The patient's sister worked in medical records and the sister requested PR for pain medication. However, the client says that the patient himself is supposed to request PR for pain medication. [Meanwhile, the RN at the desk had no patients. The other nurse completed treatment for patients.] The Hospice nurse gave the order around the clock for 2.5 mL of morphine. The patient last had morphine 2 days before. Patients have the right to refuse morphine, and Mr. Layfield (the patient) did refuse morphine. Because of this continuous refusal, the client received a phone call from the family to give medication to the patient. The patient's son spoke on the phone with the client and yelled at the client to give medication to the patient. However the patient kept refusing. Finally, when the son is still talking to the patient on the phone, the client gives the patient 5 mg of morphine on the tip of the tongue. He had not refused that time. The client says that the patient had never complained of pain. However during this time he had a kidney bleed-out. Because he did not complain of pain, the nurses did not realize this. An LVN nurse takes orders from the RN and MD. Usually what happens is that the Heart Association orders anyone (including LVN) to automatically send a bleed-out patient out to emergency care. However the client did not know he had a bleed-out. In addition, since he was Hospice they did not transfer him out and the doctor told the LVN to make the patient comfortable.  The Hospice nurse eventually comes in and gives an order for 20 mg of morphine for the patient. The Hospice nurse immediately leaves the hospital, telling the LVN that there is more help on the way. However, no nurses came to work for over 2 hours.

Case #:              Caseworkers: Christina Chiang,   Patrick Loi, Stephanie Cho
Case intake date/time:November 9, 12:30 PM
Follow-up date/time: November 30

The patient dies 2.5 hours after receiving the 20 mg of morphine from the Hospice nurse (the nurse had left immediately after giving the morphine). The client does not know what the official cause of death is, but she believes that it was due to the kidney bleed-out. The patient's wife calls the client and yells at her asking her why she did not call her when the patient died. In addition she says that the wife called her a "n*gger." The client thought that other family members had stayed with the patient all day.

The client says that the patient's son went to her house later that month and tried to get her granddaughter to open the door. Her alarm system/ motion detector showed that someone was in the house on July 24, 2006. On August 7 and 25, it showed someone else had entered her house. At first she thought it might have been the construction team working to rip out the mold from her insulation, but then realized it was not. In addition the client says that someone had damaged her car. The damages totaled $2800. The client says that the patient's son was seen outside of her house. The client ended up looking up the patient's criminal records and she moved, because he and his son both had extensive criminal records. She also tried to obtain a restraining order against the son but the courthouse said they could not locate him. She wants to know how to successfully obtain a restraining order.

The client's family filed a wrongful death lawsuit against her, by saying that she had refused the client pain medication. However her defense is that he was has a right to refuse medication. In addition because he was Hospice she can't send him out without protocol from the MD, the RN, and the Hospice nurses. In addition she said that the Hospice nurse had given the patient 20 mg of morphine, which may have been dangerous and caused respiratory arrest. The patient's family sued the client, the hospital, and the registry. However they did not sue the Hospice team. The client believes that this is because the Hospice team is white and she is black.

The client got an attorney for $2500, but she can't afford the attorney because she is an undergraduate student. The California Board of -- cleared the client from the accusations of wrongful death going on her professional record, but the lawsuit is still going on. The client says that she has a right to sue for retaliation for protective services.

In addition, the client mentions that her father had passed 1 month after this event without an autopsy/no biopsy. He was 88 years old and went from healthy to dead in one month. The report was that the immediate cause was cardiopulmonary arrest and the sequential cause was metastatic sarcoma. The client says that cancer patients usually have a biopsy prior to surgery. However the client says that her father did not have a biopsy prior to operation on the abdomen. She believes that this is either an omen or a way for the hospital to punish her.

In addition, the client says that other black nurses also have experienced discrimination, and she is interested in filing a discrimination suit against the hospital. She feels as if the hospital is using her as a scapegoat. The client had asked the hospital to pay for her legal fees—since their lawsuits are directly related—but the hospital had refused.

#3

300 Gooding Way #343

Albany, California, 94706

January 23, 2008

To the Office of the Surgeon General

5600 Fishers Lane Suite 1866 - 1867

Rockville, Maryland, 20857

Attention - Dr. Steven Galson

Dear Sir,

I am writing to you for help in a very difficult situation in California that is a result of my work. During the summer of 2006 I worked in a hospital in Fairfield, California that has become a very big problem for me and my family. According to the law, the Nurse Practice Act, and the Patients Bill of Rights - I did not do anything wrong. Still the family of the patient has pursued me with a law suit. Their family has threatened my family including a six year old child. We have moved several times due to them stalking us. The trouble is that the family of the patient has an extensive criminal record. They have not been rational and have ignored the fact that the father refused the medications that the family wanted me to administer. That is the reason why I included the paper on Nursing Ethics. All of the events of the whole case can be considered coercion to enforce the administration of hospice medications by a non-hospice nurse. On this day I was responsible for thirty eight patients for sixteen hours and the hospice nurse had only one imminent hospice patient that she gave one medication to and refused to stay with the patient and the family afterwards. It was very disappointing to me that she seemed more concerned with the discipline of a subordinate nurse than the quality of

nursing care for her hospice patient whom she had a contract with the patient and the family. The hospice nurses are trained for caring for the terminally ill and the families and even though I am an LVN it seemed to me that her concern for the patient was not more important than her Saturday evening when she left and I asked her to stay with her patient. When she first came in she stated to me "You can stop talking now".

In my opinion the hospice nurse was more engaged in assessing my nursing skills than her patient and it is my opinion that it was for the coercion to administer the Morphine to a patient even when he refused. There are sixteen reasons why this is my opinion - 1. An unusual inservice by the Director of Nurses who was at that time Dianne Cavanaugh earlier in the week informing the nurses how three nurses were arrested for not administering medications, they were placed in prison for a week and later bailed out by the hospital, al bypassing the usual on the job protocol of discipline - write - ups, suspensions, dismissals and terminations, citations to the board, fines, etc., they were sent directly to jail. 2. The failure of the staff RN to the patient to dialysis for a week and failure to arrange transportation on that Saturday for him to go to his one o'clock appointment. It was the responsibility of the desk nurse who was an RN and has since returned to India. 3. Even after repeated request for help by me, the refusal of the two RN staff members to intervene with the care of a critical incompliant patient and the emotionally charged and volatile family who were present from 1130 that day until the patient passed. Three were there the whole time and others came in intermittently with numerous phone calls from the family all day demanding pain medication when the patient refused all day - food, water, medication, and dialysis. The patient consistently refused pain medication for over forty eight hours. 4. Their notion of help from the RN

-2.

was to obtain an around the clock order for Morphine whether he refused or not. 5. I was very busy with thirty eight patients who were very demanding and cooperative. 6. The refusal of the hospice nurse to stay with the patient and the family even though she had extensive training and experience for both. 7. The unclear guidelines that qualify a patient for hospice by Medi - Care and Medi - Cal in this case. 8. The neglect of the second hospice nurse of not showing up after two and a half hours when the first one stated that she was on the way and would be there within fifteen to thirty minutes. 9. The extremely irresponsible hospice MD who later sent "woof tickets" instead of transfer orders according to the investigation by the state, he did not come in to assess his patient nor did he modify the dosage of the Morphine when dialysis was missed and according to the pharmacopeia the dosage should be modified when a patient misses dialysis due to the exaggerated side effects of the medication with the accumulative effects of the medications in an already overloaded and compromised system of the patient. 10. There was no intervention by the MD on site even after assessing the patient in the room on my insistence. 11. The verbal assault and abuse in a vulgar vernacular by the administrator Mr. Davies, who is no longer there, and his attempt to mandate a triple shift of me to do paperwork - "You better document every thing and then get you're a_ _ out of there!" This delay could have endangered me by a direct confrontation with a family member enforcing street drug methods on a nurse that has not had one complaint in twenty - five years of nursing. The documentation was submitted to the hospital the next day and I also sent a copy to the police and three copies has since disappeared. Still with his delay and I was followed home that night and I had a half an hour commute. Once inside I on my Alarm One System. Before I left the hysterical and seemingly terrorized wife of the

plaintiff called me screaming irrationally and cussing and threatening me and my family, they even called me on my home number and the family was seen in my back yard a male covered with their green tattoos tried to get a six year old to open the door. After many attempts, I still can not get the restraining order against them. After several moves I still noticed them driving by on last Sunday. 12. The hospital filed a criss cross suit against me instead of defending me and that is a conflict of interest along with the fact that the wife is still employed there arousing the question is this an inside endeavor to extrapolate a "million dollar" of money from someone. Is that another conflict of interest? 13. The chart has not been summoned and it is a legal document. 14. The eye witnesses at the beside along with the auxiliary crew has not been questioned. 15. The two Catholic priests that were there are not forthcoming to say testify about the condition of the patient. 16. The untimely and swift demise of my own father in Southern California after I explained to the staff that I would never harm a patient since I had a father alive also.

The whole case was preceded by another incident where I had reported to the authorities a nurse in their hospital that claimed to be a "hit man" for a Los Angeles gang and showing everyone his tattoo that was his gang identity on his shoulder. I reported this information to Department of Justice in Oakland, California. They told me to have the judge call them before the case is heard on February 4, 2008 in Fairfield, California.

The problem with the conflict with the hospice team is that they do not seem to have much regard for the law. An example of the kind of disregard of the law is that even if Cannabis is illegal they have at least three stores that openly sell it for the hospice patients knowing that it is against the federal laws. If a group of nurses and physicians disregard the law and the ill effects of Cannabis, how can I expect that they would inform

the family that I was medically correct to with hold Morphine Sulfate from a patient when the patient refused the medication.

The family members functioned in the manner of a true paradox, on the one hand they seemed very concerned for the welfare of the patient and yet there are four reasons why I question their intent. 1. It was a seemingly premature contract with the hospice team and the patient objected to the hospice medications both verbally and non-verbally. 2. It would have been more beneficial to the patient the emphasize and prioritize the dialysis treatment, yet the hospice nurse disclosed that the family did not want to pay for the continuation of dialysis. Before the hospice contract the Medi-Cal or Medi-Care paid for it. Instead of the family transporting the patient to the Dialysis Center once the transportation was not there, they had a "let's play hookey from dialysis" effect by distracting the patient from vital medical care with an all day vigil. 3. They collectively ignored the patients refusal of Morphine Sulfate even though they watched me place the medication very close to his mouth on at least five different occasions of their request and they watched the patient refuse. The patient never complained of pain that day and before he did willing accept the pain meds and that is why I knew that he would take the medication if he wanted to. 4. Instead of fact finding the family started a law suit. The son stated "I have a million dollar law suit and you are not going to serve me with that restraining order." It was then that I realized that they were two different people and looked in the background and noticed that he has four alias names that he uses.

To be honest, this is making mockery of the honest work ethic if they let known terrorists with extensive felony records [ in his case at least twelve] bully and stalk and sue working people, and threaten our families all to cheat a hospital out of a million

dollars.

There were three visitors present all day long that have not come forward. Also I requested Dr. Adolfo Daiquioug to enter the room and assess the patient. Also two Catholic priests visited the patient that day. Also the auxiliary staff of certified nurses assistants, housekeepers, dietary are all of one mind. They do not want to be stalked, family threatened, house entered when they are not there, car damaged, or have their tires slashed. All are reluctant to come forward. No one wants a conflict or confrontation with the family member who has the reputation of being a terrorist, and neither do I. Even at the last court hearing, the family sent a four hundred pound man to monitor the case who sat in the back. I wondered if he was just present to intimidate us all by his mere presence.

In the beginning of the case I had an attorney, however when it became nine law suits I could no longer afford to pay him. Then I consulted the law students at school. The Berkeley students helped me with a defense - they recommended a demurer since I was not giving the orders and others were in authority to give the orders at the time there were three RN's there, one supervisor, one treatment RN, one hospice RN for a short while and one hospice RN on the way who never arrived, also there was a physician in the facility, a hospice physician giving orders and attending regular physician on the case and a Medical Director, an administrator, and a Director of nurses all at home due to the week end while I had thirty eight patients for sixteen hours. The California State Bar is looking for a pro bono attorney for me now. Still the family of the patient thinks that he has a million dollar lawsuit and is suing me and the hospital. The wife of the plaintiff is still working at the hospital and it is believed that she has changed the medical chart

according to the owner of the Service First Registry, Juanita Overton. The Chart has not been summoned yet and to me it is vital to the case, right along with the eye witnesses, the law, and the Nurse Practice Act all of them are currently being ignored by the hospital and the plaintiff and his attorneys.

Therefore I am requesting your help in any way that you can help me. Please review this case and the circumstances involved and give me your recommendations both medically and legally. In my humble opinion the hospice team is very similar to the crew of the examples in the Nursing Ethics paper and that is alarming - does it seem that way to you also?

I included the information about my father and the fact that he had a diagnosis without a tissue sample and surgery and still no biopsy, wound dehiscence that required a hospice team, and no chance of survival after the hospice order of Morphine Sulfate every two hours when there were no instructions to monitor respirations. These events along with the fact that he already had a biopsy that was negative in North Carolina with his physicians that knew him over thirty years are reasons to question the intent of the hospice crew. Due to HEPPA the California hospice team that treated him did not respond to my inquiries about his prognosis and my family stated that when they instructed them to give Morphine Sulfate every two hours they did not inform them to count the respirations and he passed away overnight once the two hour order was given. Once my attorney took my case his mother who was in good health passed away suddenly and quickly while in another hospital. My father was also in good health in late July when I called for my brothers birthday - he stated that he had just visited the doctor and had a good report card meaning that all is well. Is this the way a nurse is disciplined, Sir?

All of this is very overwhelming and I need your help and advice. Kindly advise me what to do in this case. God is my witness that I did nothing wrong. Thank you.

Respectfully yours,

Selene Stewart

Selene Stewart

**CERTIFICATE OF DEATH**
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS

3200656003125

| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |
|---|---|---|

**DECEDENT'S PERSONAL DATA**

| 1. NAME OF DECEDENT — FIRST (Given) | 2. MIDDLE | 3. LAST (Family) |
|---|---|---|
| BRUCE | TONSTER | STEWART JR. |

| AKA, ALSO KNOWN AS — Include full AKA (FIRST, MIDDLE, LAST) | | | 4. DATE OF BIRTH mm/dd/ccyy | 5. AGE Yrs. | IF UNDER 1 YEAR | IF UNDER 24 HOURS | 6. SEX |
|---|---|---|---|---|---|---|---|
| - | | | 08/17/1918 | 88 | Months / Days | Hours / Minutes | M |

| 8. BIRTH STATE/FOREIGN COUNTRY | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? | 12. MARITAL STATUS (at Time of Death) | 7. DATE OF DEATH mm/dd/ccyy | 8. HOUR (24 Hours) |
|---|---|---|---|---|---|
| DC | 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 | ☒ YES ☐ NO ☐ UNK | WIDOWED | 09/02/2008 | 0652 |

| 13. EDUCATION — Highest Level/Degree | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see markdown on back) | 16. DECEDENT'S RACE — Up to 3 races may be listed (see markdown on back) |
|---|---|---|
| SOME COLLEGE ☐ YES | ☒ NO | BLACK |

| 17. USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | 19. YEARS IN OCCUPATION |
|---|---|---|
| MAIL CLERK | POSTAL SERVICE | 15 |

**USUAL RESIDENCE**

| 20. DECEDENT'S RESIDENCE (Street and number or location) | | | | |
|---|---|---|---|---|
| 2905 DOVE CANYON DRIVE | | | | |

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| OXNARD | VENTURA | 93036 | 3 | CA |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) |
|---|---|
| BRUCE STEWART III, SON | 2905 DOVE CANYON DR., OXNARD, CA 93036 |

**SPOUSE AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE — FIRST | 29. MIDDLE | 30. LAST (Maiden Name) |
|---|---|---|
| - | - | - |

| 31. NAME OF FATHER — FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
|---|---|---|---|
| BRUCE | - | STEWART SR. | DC |

| 35. NAME OF MOTHER — FIRST | 36. MIDDLE | 37. LAST (Maiden) | 38. BIRTH STATE |
|---|---|---|---|
| CORDILIA | - | WILLIAMS | VA |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy | 40. PLACE OF FINAL DISPOSITION |
|---|---|
| 09/07/2006 | SAINT BARTHOLOMEW'S EPISCOPAL CEMETERY 204 WEST SALISBURY, PITTSBORO, NC 27312 |

| 41. TYPE OF DISPOSITION(S) | 42. SIGNATURE OF EMBALMER | 43. LICENSE NUMBER |
|---|---|---|
| TRANSIT/BURIAL | ▶ THOMAS E. GREGORIE | 6033 |

| 44. NAME OF FUNERAL ESTABLISHMENT | 45. LICENSE NUMBER | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE mm/dd/ccyy |
|---|---|---|---|
| GARCIA MORTUARY | FD-1338 | ▶ ROBERT M LEVIN, MD | 09/06/2006 |

**PLACE OF DEATH**

| 101. PLACE OF DEATH | | 102. IF HOSPITAL, SPECIFY ONE | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|---|
| RESIDENCE | | ☐ IP ☐ ER/OP ☐ DOA | ☐ Hospice ☒ Nursing Home/LTC ☐ Decedent's Home ☐ Other |

| 104. COUNTY | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) | 106. CITY |
|---|---|---|
| VENTURA | 2905 DOVE CANYON DRIVE | OXNARD |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) | CARDIOPULMONARY ARREST | MINUTES | ☐ YES ☒ NO |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | METASTATIC SARCOMA | 1MONTH | 109. BIOPSY PERFORMED? ☐ YES ☒ NO |
| (C) | | | 110. AUTOPSY PERFORMED? ☐ YES ☒ NO |
| (D) | | | 111. USED IN DETERMINING CAUSE? ☐ YES ☐ NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) | 114. IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| EXPLORATORY LAPAROTOMY 08/24/2006 | ☐ YES ☐ NO ☐ UNK |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since / Decedent Last Seen Alive | ▶ ANN S. KELLEY, M.D. | G58702 | 09/06/2006 |
| (A) mm/dd/ccyy 08/11/2006 | (B) mm/dd/ccyy 08/22/2006 | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE ANN S KELLEY M.D. 1700 NORTH ROSE AVE SUITE 320, OXNARD, CA 93030 | |

**CORONER'S USE ONLY**

| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 120. INJURED AT WORK? | 121. INJURY DATE mm/dd/ccyy | 122. HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH ☐ Natural ☐ Accident ☐ Homicide ☐ Suicide ☐ Pending Investigation ☐ Could not be determined | ☐ YES ☐ NO ☐ UNK | | |

| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) |
|---|
| |

| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|
| |

| 125. LOCATION OF INJURY (Street and number or location and city, and ZIP) |
|---|
| |

| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| ▶ | | |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH. # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | *012006000314304* | | |

CERTIFIED COPY OF VITAL RECORDS

*000532478*

STATE OF CALIFORNIA } SS.
COUNTY OF VENTURA } DATE ISSUED

This is a true and exact reproduction of the document officially registered and placed on file with the VENTURA COUNTY RECORDER.

This copy not valid unless prepared on engraved border displaying seal and signature of County Recorder.

PHILIP J. SCHMIT
COUNTY RECORDER

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

*#5*

# Nursing Ethics

### Duty and 'Euthanasia': the Nurses of Meseritz-Obrawalde
Susan Benedict, Arthur Caplan and Traute Lafrenz Page
*Nurs Ethics* 2007; 14; 781
DOI: 10.1177/0969733007082118

The online version of this article can be found at:

Published by:

SAGE Publications

**Additional services and information for *Nursing Ethics* can be found at:**

**Email Alerts:**

**Subscriptions:**

**Reprints:**

**Permissions:**

**Citations** (this article cites 4 articles hosted on the
SAGE Journals Online and HighWire Press platforms):

Downloaded from                    at CALIFORNIA DIGITAL LIBRARY on December 1, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.



# DUTY AND 'EUTHANASIA': THE NURSES OF MESERITZ-OBRAWALDE

## Susan Benedict, Arthur Caplan and Traute Lafrenz Page

Key words: ethics; euthanasia; Nazi; psychiatry

This article examines the actions and testimonies of 14 nurses who killed psychiatric patients at the state hospital of Meseritz-Obrawalde in the Nazi 'euthanasia' program. The nurses provided various reasons for their decisions to participate in the killings. An ethical analysis of the testimonies demonstrates a belief in the relief of suffering, the notion that the patients would 'benefit' from death, their selection by physicians for the 'treatment' of 'euthanasia', and a perceived duty to obey unquestioningly the orders of physicians were the primary ethical reasons that were stated for their behavior. However, 20 years had elapsed between the killings and the trial, thus giving ample opportunity for the defendants to develop comfortable rationales for their actions and for their attorneys to have observed successful defenses of others accused of euthanasia.

## Duty and 'euthanasia': the nurses of Meseritz-Obrawalde

It is difficult to imagine a time when nurses complied with a policy of murdering their patients. It is frightening to realize how few resisted and how many rather easily complied. It was a time when nurses relinquished individual ethics for the government's 'greater good'.

Several phenomena had to converge to make 'euthanasia' a government sanctioned practice. During this era, there was a widespread belief, in Germany as well as other European countries and the USA, that a population could be made healthier through selective breeding. This was the so-called 'science' of eugenics. It was adopted so enthusiastically in Nazi Germany that laws were passed to prohibit people with hereditary disabilities from marrying or to require involuntary sterilization. Thus there was a wholesale devaluation of people with disabilities. Combined with this were the war effort and a poor economy. The government argued that the valuable resources of medicines, hospital beds and nursing care could be better allocated to healthier, and thus more valuable, members of society. Devaluation of disabled people became almost a sign of patriotism as the health of the people as an entity superseded that of individuals who were likely unable to contribute positively to the economy.

Address for correspondence: Professor Susan Benedict, College of Nursing, 99 Jonathan Lucas Street, Charleston, SC 29425, USA. Tel: +1 843 792 3816; Fax: +1 843 792 2104; E-mail: benedics@musc.edu

*Nursing Ethics* 2007 14 (6) © 2007 SAGE Publications          10.1177/0969733007082118

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

782  *S Benedict* et al.

Psychiatric patients became an especially vulnerable group because many were housed in government-supported institutions for long periods of time. It was the therapy of the day for patients to work while hospitalized and often the institutions were almost self-sustaining microcosms. They had their own gardens and farms and, as per patient funding decreased, these often had to provide food for patients and staff. Patients who were unable to work even at simple chores such as mending and sweeping were considered worse than useless: they consumed resources without any contribution.

Beginning in 1939, the National Socialist Government of Germany implemented a policy of killing children with physical or developmental handicaps and 3000–5000 were killed in this children's 'euthanasia program'.[1] In September 1939, Hitler authorized the following, thus expanding the program to include adults:

> Reichleiter Bouhler and Dr med. Brandt are charged with the responsibility to extend the authorization of certain physicians designated by name in order that patients who must be considered incurable on the basis of human judgment may be granted the mercy death after a critical evaluation of their illness. Adolf Hitler (p. 67).[2]

This brief statement paved the way for the establishment of an organized program of murder under the domain of the Chancellery of the Führer and the Public Health Section of the Reich Interior Ministry, and became a death sentence for thousands. The murder program was known as T-4 after the organization's headquarter's address at Tiergartenstrasse 4 in Berlin. Beginning in January 1940, the first of six killing centers was established for the gassing of psychiatric patients. All but one of these gas chambers (at Brandenburg) were established at working psychiatric hospitals, including Hadamar, Hartheim, Sonnenstein, Bernburg and Grafeneck. It is estimated that 70 273 adult psychiatric patients were killed in the T-4 program.[1]

By 1941, the killings were becoming public knowledge and vocal opposition arose from the Catholic churches. In particular, Bishop Clemens August Graf von Galen of Münster openly condemned the killings in a sermon delivered on 3 August 1941.[1] In addition, people in the towns surrounding the killing centers were aware of the suspicious buses with windows painted over that brought transports of patients to the psychiatric hospitals. The arrival of the buses was soon followed by billowing smoke from the chimneys of the crematoria.[3] Due at least in part to public awareness, the T-4 organization ordered the gassings to be stopped on 24 August 1941.[1]

This order did not, however, end the murders of the psychiatric patients. A number of psychiatric institutions received so-called 'special orders' and continued with the killings on an individual basis, usually by lethal injection. This phase of the Nazi 'euthanasia' program was known as 'wild euthanasia'.[2] One of the main sites of these murders was the Meseritz-Obrawalde psychiatric hospital.

The purpose of this article is to describe the wild euthanasia program at Obrawalde and to analyze the actions of the nurses involved in the killings. Most of the primary source documents, including statements of witnesses and defendants, were obtained from the state archive in Munich, Germany. Initial requests for access to the documents related to the Meseritz-Obrawalde trial were denied due to the fact that some of the accused were thought to be still alive; however, permission was granted on appeal with the condition that the last name of the accused would not be used in any publication. Additional documents were obtained from the Archives of the Resistance

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

in Vienna, Austria; from Yad Vashem, the Holocaust museum and archive of Israel; and from the Meseritz-Obrawalde hospital's 'Memorial Chamber', an archive and display room dedicated to the memory of the patients who were killed there. Many of these documents were sworn statements, thus supporting internal criticism or reliability of the documents. Additionally, secondary source documents were used to verify the events and provide for greater context.

Today the hospital Obrawalde is known as Obrzyce and is located in the eastern sector of the town of Międzyrzecz (formerly Meseritz), Poland. It is still a working psychiatric hospital with about 20 buildings, most of which are used to house patients. Each of the two-story brick buildings is of the same unique style and located in wooded grounds. The college campus-like atmosphere belies the terrible events that took place there 60 years ago.

Until 1937, the hospital Obrawalde belonged to the German state of Prussia, located in the border province of Posen/West Prussia. In addition to psychiatry, there were many departments in the hospital, including internal medicine, neurology and obstetrics. There were homes for children and elderly people, as well as for 'crippled patients'.[4] In 1938, all general medical departments were abolished and Obrawalde became exclusively a psychiatric hospital, and, by 1939, it contained approximately 900 psychiatric patients. Within a year, this number increased to more than 2000, with only three physicians, Drs Mootz, Vollheim and Wernicke, to care for them.[5]

In 1941, Walter Grabowski, a former salesman who was regarded as an especially zealous Nazi, was appointed as administrative director of Obrawalde. He implemented a number of changes in the hospital that affected the nurses and caregivers (nurses' assistants), including 14-hour work days. Grabowski was often rude and intimidated the hospital employees, thus making the atmosphere among the employees become one of distrust.[6]

Wild euthanasia began at Obrawalde under the supervision of Grabowski at the end of 1942. Among those murdered were inpatients of Obrawalde as well as other patients who were transferred there for the purpose of being killed. Transports of psychiatric patients from other institutions began arriving at Obrawalde at the beginning of 1942 and became even more frequent during 1943. These patients were unloaded by the nurses and caregivers and were in horrible condition, often being very emaciated and dirty. Wernicke postulated that these conditions helped the staff to distance themselves from the patients and to see them as less than human, which may have contributed to the willingness of the staff to kill them.[7]

Inpatients were selected for death by the head physician, Dr Theophil Mootz, and Dr Wernicke. These doctors reviewed the patients' files and, occasionally, briefly examined the patients. In addition to patients who were severely ill, those whose behavior was more normal but who were unable to work were also killed. The actual killings were left to the nurses and caregivers. Wernicke contended that it would be 'too obvious' if she were to do the killings herself.[8]

In the women's portion of Obrawalde, the killings took place in Houses 1 and 3 (children), 6 and 8 (infectious diseases), and 9 and 10. Among the men's units, most of the killings took place in House 18.[5] On these units, 'isolation' rooms were designated to be killing rooms. The doomed patients were taken singly into the isolation room before being administered the lethal medication. Patients from units without the special rooms were transferred by the caregivers to units able to accommodate the procedure.[9] Prior to being taken to the special rooms some patients were premedicated

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

with Veronal (barbital, diethylbarbituric acid) or another sedative. Once in the room, in most cases, the killings were done with an overdose of a sedative such as Veronal or Luminal (phenobarbital). Usually 10 tablets (or the equivalent amount of powder) were dissolved in water and given by mouth. If the patient was unable or refused to take oral medication, an injection of morphine and scopolamine was given. Occasionally, an injection of air into a vein was the mode of murder.[9] Killing with oral medication was in the following manner:

> In general either the ward caregiver or I would sit the patient up in her bed, put an arm around her, and talk to her consolingly. So one of us would hold the patient in an upright position and the other caregiver would hold on to the glass with the medication. Then the patient either was able to swallow the liquid on her own or it was given to her with a spoon. If the patient was extremely restless, which also happened quite frequently, then three caregivers were needed for the procedure.[9]

The patients would soon fall asleep and usually die within half a day. Those who were given the air embolus died within minutes and those who received morphine and scopolamine died within a few hours. In the early days of the killings, the caregivers had to remove the bodies themselves. Later, as the number of killings increased, a group of male patients, 'the cemetery gang', was organized.[5] Bodies were buried in one of Obrawalde's own cemeteries.

The patients' deaths were documented in a specially created office in the hospital. Here the death certificates were prepared and signed by the physicians.[2] Inevitably, the true cause of death was not provided; rather, a common and plausible diagnosis such as 'stroke' was supplied.

Otto Freund, a patient at Obrawalde, described how corpses were buried in mass graves, with five to seven being placed on top of each other and wrapped in black paper. A special coffin with a trap door was built and used for funerals that were attended by relatives. The trap door was hinged so the body dropped directly into the grave after the ceremony and the coffin could be reused.[10] Hedwig Neumann Vollheim, who worked as a laboratory and X-ray assistant at Obrawalde, provided an employee's perspective. She stated that all of the caregivers talked of the killings and the patients became restless. She described seeing as many as 50 corpses stacked in the morgue.[11]

On 29 January 1945 the Soviet army arrived at Obrawalde. Many of the personnel, including the director Walter Grabowski and Drs Mootz and Wernicke, fled, leaving behind 1000 patients and workers to survive on their own.[12] The nurse Amanda Ratajczak also escaped but was captured by the Soviets in early March 1945. She admitted to killing over 1500 patients herself. In fact, her last murders occurred just one day before the arrival of the Soviet army.[12] Ratajczak was given a brief trial by the Soviets, including a filmed re-enactment of her killing method, and was sentenced to death by the Soviet authorities. Ratajczak, along with the male caregiver Hermann Guhlke, was shot on 10 May 1945.[13]

Within a few months of the arrival of the Soviet army, pathologists were sent to Obrawalde to further investigate reports about the killing of patients. Survivors reported that 30–50 patients had been murdered daily in the hospital over a period of several years. Supporting these reports were the findings of over 800 ampoules of morphine and over 2000 ampoules of scopolamine, syringes and store rooms with huge quantities of patients' clothing and shoes. There was a crematorium, an

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

uncompleted gas chamber and two mass graves with over 1000 corpses in each. The pathologists established that 18232 patients had died at Obrawalde over a three-year period and this number was corroborated by Amanda Ratajczak during her trial.[12]

Nurse Helene Wieczorek and Dr Hildegarde Wernicke were tried in the first 'euthanasia' trial before a West German court in March 1946.[12] Both were sentenced to death in Berlin on 25 March, 1946 and appealed the judgment.[14] The appeal was denied and they were executed on 14 January 1947.[12]

# The nurse defendants of Obrawalde

In 1965, 14 nurses who were accused of killing, or assisting with killing, patients hospitalized in Obrawalde during the period 1942–1945 were tried for their actions. Another nurse who had been investigated for the accusation, Berta Koslowski Neft, committed suicide before the trial.[13]

Almost 20 years had elapsed between the killings and the trial of these 14 nurses. This interval would prove to be extremely important for the defense. Not only did the attorneys have the benefit of seeing successful defenses of others accused of 'euthanasia', but the defendants themselves had plenty of time to rationalize their actions and prepare plausible explanations. Perhaps of equal if not greater importance, the public interest in the crimes of National Socialism had waned. By 1965, Germany was more than ready to be done with the Nazi war crimes. In an important trial of SS men from Auschwitz held in 1965, the year of the nurses' trial, a prosecutor stated: 'The majority of the German people do not want to conduct any more trials against the Nazi criminals' (p. xi).[15] In the same year, the West German Minister of Justice in Bonn 'pleaded that the "murderers among us" be left in peace' (p. xi).[15]

The nurses' trial was held in Munich, Germany, beginning on 22 February and concluding on 12 March 1965.[5] German law prohibits the identification of these individual defendants by their full names.

## Luise E

Luise E was the main defendant in the trial. She was accused of participating in the killing of 210 patients. Luise E's initial duty at Obrawalde was to supervise the patients during 'work therapy' each day. After about a year, in late 1942 or early 1943, she was made head nurse on the 'restless' unit. Dr Wernicke was the only physician responsible for these patients and it was under Dr Wernicke that Luise E experienced her first case of 'euthanasia'. The following is from her deposition taken in the Bavarian State Office for Criminal Investigation, Wasserburg, Germany, on 19 June 1961.

> Neither Dr Wernicke nor any other person in Obrawalde ever talked to me about euthanasia. I never was told or sworn to keep these things secret. There never was a lecture or other form of instruction about the subject. I thought it was presumed that I agreed with the practice of euthanasia. My personal idea was that I would prefer such a mercy killing in case I had some terminal incurable disease – be it physical or mental.
>
> Although this was my inner attitude, I had to fight severe inner battles when I was confronted with the problem of partaking in euthanasia. The way I experienced it at that time it seemed more like killing human beings. Was there any form of legislation which

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

would allow such killings? I was never told that such a law existed. At another time, Dr Mootz assured me I should not worry at all about these things because he would cover up for me. These remarks gave me the idea that there was something legal about the practice of euthanasia.

I have mentioned during previous questioning that I myself thought there was a true justification for the killings only in about one-half of the killings ordered. In my opinion, only those patients should have been killed who showed all signs of a very near end of their lives – maybe about three weeks or less until they would die, or other patients who had so many deep bedsores [decubitus ulcers]. They were suffering greatly and there were neither the necessary ointments and bandages nor any medication available for their condition. Or other patients who really were at the end of their human existence such as those who would eat their own feces and needed continual observation for those and similar acts. I did not approve of killing patients who had totally lucid intervals between their attacks of insanity and those in whom I could see some hope for improvement. These were the cases which caused me the severe conflict that I have talked about.[9]

Luise E stated that she was of the Protestant faith and believed in the commandment that 'Thou shalt not kill', yet acknowledged that her killings 'offended this commandment'. She stated that she had serious inner conflicts about this and had prayed for forgiveness, all the while seeing death as a release from suffering for those who were so desperately ill.[7]

In a stunning petition by K Merkenschlager, an attorney representing Luise E in the trial, the argument was presented that Luise E could not have possibly killed 200 patients but, in fact, killed or assisted with the murder of *only* 110 people, based on her vacation time, days off duty, and the fact that killings did not occur on Saturdays, Sundays or holidays.[16]

## Anna G

Anna G joined the Nazi party in 1935 but claimed never to have been active. She worked as a nurse at Obrawalde beginning in 1941 and remembered that euthanasia was practiced quite openly on her ward. At the time, too, she spoke of her concern that she and others would one day 'end up in prison because of what we are doing here'.[17]

The first case in my memory when I partook in a killing was when Luise E called me to give her a hand. I was called into a small room. There was a severely ill woman about 40 years old. Luise E ordered me to dissolve the medication in water. From the dose, I knew it would be lethal. Luise E then gave the medication to the patient. I held on to the patient who was violently objecting to the drink. If she knew what it was that she was drinking, I do not know. Later I was ordered by Miss H to check on the patient until she was dead. Later I learned that Dr Mootz would point out certain patients during his rounds to the head nurse and he would request their records. Those were the patients to be killed.[17]

When asked by the interrogator why she assisted even after realizing the dose was lethal, Anna replied that she was told to follow orders. Anna G worked in House 6 for four to six months. During that time, she was a participant in the killing of approximately 20 patients, mainly by bringing the patients to the small special room or by preparing the medication.

I do not know of any caregiver who refused to partake in these procedures. I also do not know of any caregiver who was sent to a concentration camp. My sister who was a

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

Protestant nursing sister [Diakonisse] refused to partake in anything. She had strong support from the motherhouse. Other caregivers did not have support like this. At times I thought to ask for a transfer but I was afraid of losing my job and I had to support my father. I was especially afraid of Grabowski – he even had the church of the institution closed.[17]

In a paradoxical statement, Anna G exhibited her 'caring':

We really wanted to make the last day as easy as possible for the selected patients ... I remember that one patient was a strict Catholic and on her last day she asked for a priest so that she could receive the last sacraments. I remember very clearly and can say with absolute certainty that the priest was informed before the killing and that the patient, who at least on that day was completely in her right mind, received the sacraments from the priest.

... I can't remember that I ever appointed a younger nurse to help me. Young nurses deliberately were not appointed to participate in the killings because we feared that they would not be able to keep their mouths shut ... The killing of patients was never done by only one nurse. Practical experience had shown that it was absolutely necessary that the killing was done by at least two nurses ... Nurses are also only humans and the strength of their nerves is limited. I think the two nurses had to support and help each other when doing the killings. The killing of a person is a hard strain on the nerves of the person doing it. After all, it could have been possible that the strong nerves of one nurse would not have been enough ... one nurse could have fainted or she could have shrunk back. But when two or more worked together, the other would have helped to surmount the weak moment. But the cooperation was not only absolutely necessary for psychological but also for practical reasons. I did not experience it one single time that a patient took such a large quantity of dissolved medicine voluntarily.

... On giving the dissolved medicine, I proceeded with a lot of compassion. I told the patient that they would only have to take a cure. Of course I only could tell these fairy tales to those patients who were still in their right minds ... I took them in my arms lovingly and stroked them when I gave the medicine ... I talked to her nicely, now that she had drunk so much, and told her to finish the rest, otherwise the cure would not be complete ... Old women who could not drink the medication or be spoon-fed were to be given an injection. They were not to be tortured more than necessary (p. 239).[7]

## Martha W

Martha W was born on 24 July 1908. She also worked in House 6 at Obrawalde at the time when Dr Mootz was the physician and Luise E was the head nurse. Martha testified that she had been raised as a Catholic and had learned the commandment 'Thou shalt not kill' but, all the same, participated in the killings despite disapproving of euthanasia.

Nevertheless, I participated in the killings and I recognize that I acted against the commandment and my conviction and I have burdened my conscience seriously. The only explanation that I can give is that I did not have enough time to think about it at that time because the nurses were put under a lot of stress (p. 249).[7]

When Martha W was asked if the patients knew what was happening, she replied:

... [a certain patient] asked for me, so I went to see her. The patient told me that it was her turn the next day ... She asked me to get a priest as she wanted to make her confession.

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

> The patient knew exactly what was going on. She asked me to tell her relatives as soon as she died that she had passed away peacefully. She also asked me to give her the rosary after her death (p. 241).[7]

Martha W admitted to killing about 50 patients but also testified that she saved lives by often advising relatives to take patients home if she thought they were going to be killed.[18]

## Erna D

Erna D was unable to provide any explanation for her willingness to participate in the killings other than she was taught obedience and was afraid of refusing an order. She once refused to give a lethal injection and had been 'severely reprimanded' by the head nurse, Amanda Ratacjcak.[19]

## Margarete T

Margarete T was accused of 150 murders yet contended that she was still a very religious person who attended church regularly. Because of this she felt deeply guilty about her role in the killings. Like Erna D, she, too, cited strict obedience as the primary reason for her involvement. She claimed that as a civil servant she was sworn to secrecy and was compelled to obey all orders of physicians and higher ranking nurses without contemplation of the legal aspects.

> It never occurred to me not to follow the orders given to me. Just as soldiers on the front had to do their duty, so did we. To follow orders given by an attending physician absolutely is one of the most important duties of a caregiver. For this reason, the proviso that I would also have become a thief if it were ordered is beside the point. The orders given to me were within the field of my work and my training.[20]

## Meta P

Meta P also invoked the theme of obedience and discipline as the reason for her involvement in the killings by saying that among the nurses there was strict discipline and every subordinate nurse was obliged to execute the orders of her superior. Yet after one occasion when she had to accompany an ambulatory patient to another ward to be killed, she told her head nurse that she would never again take part in such a 'transfer' because she 'just did not have the heart for such things'. She was never again asked to help with the killings.[21]

## Berta H

Berta H stated that she had refused to do the killings herself and even began to cry when she heard the order that certain patients were to be killed. She stated that Dr Wernicke wanted her removed from her position as head caregiver but this did not take place. She was not punished nor was she demoted. She did, however, continue to assist with the killings by holding patients down while others forced fatal medications. She was able to convince herself that because she did not administer the medications herself that she was absolved from guilt.[22]

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

## Martha Elisabeth G

Martha Elisabeth G was accused of killing 28 patients:

> Certainly I felt guilty about it at that time and, although I did not do any of the killings by myself, I did help and I had a certain feeling of guilt … I am only an ordinary nurse … and never realized that, legally speaking, I had become implicated in the killings. When I had to assist in the killings, I acted under duress and never with the intention of killing a person … At that time, nobody would have helped us at Obrawalde if we had refused to do the work, and there was nobody to pour out one's heart to and who we could trust. As sort of slaves, we were completely at the mercy of the rulers and their political line (pp. 244–45).[7]

## Margarete Maria M

Margarete Maria M, accused of killing three patients, had a more pragmatic reason for her willingness to kill: she was afraid of losing her job as head nurse and her benefits as a public official if she had refused. She was financially responsible for her grandparents and this loss of income would have been unthinkable.[23]

## Gertrude F

Gertrude F, accused of killing five children while employed on the pediatric ward, pleaded ignorance of her actions and, at the time of her trial, she still had not accepted responsibility, citing her youth (she was the youngest caregiver in the house) and her obligation of obedience. She, too, looked on her patients with pity and saw their death as a salvation, stating that she recalled patients being asked to be relieved of 'their illness and pain'.[24]

## Erna Elfriede E

Erna Elfriede E participated in the killing of 200 patients. She was asked if she believed that the killings were legal:

> They did not make me swear on a secret matter of the Reich and I was not sworn to silence … I considered the killings as injustices …
>
> I was brought up as a Christian. I already learned as a child what one may and may not do. I learned that one must not steal and must not kill. [I did not refuse to participate in the killings] because I was ordered to do it … I do and did in the past have a strong feeling of guilt but it is impossible for me to give a reason for not refusing. It simply was ordered and I had to execute the orders (p. 246).[7]

## Trial outcome

The court found that criminal action was not proven for several of the nurses, including Erna D, Margarete Maria M and Meta P. Their statements that they had not realized that their patients were going to be killed could not be refuted at the trial. The remaining defendants were found to have been involved in the killings but they

> in no case acted on their own. They simply followed the orders of their superiors without identifying themselves with the activity or approving of it. Because the accused followed the physicians' orders when executing the killings, they had no say-so in the action. They merely have to be looked on as helpers.[5]

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

All 14 of the nurses tried in the München Schwesternprozeß (nurses' trial) were acquitted on 12 March 1965.

## Factors influencing the nurses' actions

The following factors are identified as being influential in the nurses' decisions to participate in the killing of their patients. These factors are presented not as a justification, but rather as an attempt at bringing some understanding to these otherwise almost incomprehensible deeds.

First, it is important to understand that the nurses were not well educated, nor were they sophisticated. They largely came from poor families and had completed education only to about age 14, plus one year of domestic service before going to a hospital for 18 months of on-the-job training. Additionally, and perhaps of even greater importance in the context of the killings, applicants to nursing programs had to be deemed 'politically responsible'.[25] Among the courses in their curricula were 'Genetics and race care and population politics' and 'Execution of doctors' orders'. Of the 200 hours of theoretical content, 100 hours had to be taught by physicians.[25] Compared with physicians, who were university educated and often from affluent families, the nurses' education was indeed meager and emphasized obedience to those of a superior position.

When some of the nurses of Obrawalde did question the orders of the physicians, they were told that they did not have the choice of refusal nor did they have the full responsibility for their actions. Perceptions of powerlessness were evident in the statements of several of the nurses who did not see a way around the orders, did not have anyone to talk to, had no one to trust if they told, or were the youngest nurse in the house. Others, however, did not remain powerless. They relocated, changed jobs, asked for transfers, or became pregnant so they could stop working.[3] Meta P, who was riddled with guilt after accompanying a patient to the site of his death, refused to participate, receiving only a threat of demotion but no actual consequences.[21]

During this era, the health of the nation (*Volksgesundheit*) was a national goal and took precedence over that of individuals. People who had severely compromised health were not only believed to be living 'lives unworthy of life' but were a threat to the health of the nation by drawing resources from those who were more productive, and thus 'valuable'. The principle of *Vorsorge* – the notion that the focus of care should be on the promotion of the health of the nation rather than on providing for ill individuals (*Fürsorge*) – emerged as the new order. This provided a rationale for the elimination of those who were unable either to get well or perform meaningful work. Nurses were educated to believe in this concept and to give their effort and allegiance to Hitler, National Socialism and the healthy elements of society.[26]

From their testimonies, the nurses believed that what they were doing was legal, was required by their government, was saving valuable resources for the war effort, and was contributing to making the German people stronger by eliminating those regarded as 'useless eaters'. An extremely important concept is that the nurses stated that they believed they were relieving patients from suffering. Like other German citizens of the era, the nurses and physicians had been exposed to an acceptance of euthanasia through movies advocating the killing of terminally ill people as well as those who were unable to work or lead lives that had visible usefulness.

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

Fear of the consequences of refusing to participate and fear of being reported to the Gestapo were not frequently cited by these nurses but have been given by other nurses as reasons for not refusing to help with the killings.[2] Certainly, the Gestapo was greatly feared during this era. In at least one institution, Eglfing-Haar, the nurses were made to sign pledges of silence under threat of death if they discussed the euthanasia program.[27] However, the element of secrecy is less clear at Obrawalde. Margarete T stated that she was sworn to secrecy,[20] whereas both Luise E[9] and Erna Elfriede E said that they were not.[7] Their position seems to be supported by Hedwig Vollheim's description of the killings being openly discussed.[11]

Certainly, the economy of the time was difficult and some nurses testified that they continued to work in the euthanasia program because they were afraid of losing their jobs. Additionally, housing was usually provided by the employing institution; thus to quit a position also meant relocating, something that could have been difficult during war. It is, however, at least from the perspective of 60 years post-trial, difficult to comprehend how people educated, or at least trained, as caregivers would not have been in great demand and thus able to find positions that did not compromise their ethics to the extent that they subsequently described.

## Nursing ethics and killing

In ruling for the acquittal of all 14 of the nurses, the court seems to have relied heavily on the fact that they all saw themselves as duty bound in their role as nurses to follow orders from physicians and supervising nurses. The notion of duty to follow orders was further reinforced by the perception of many of the nurses that they were also acting in the role of civil servants (i.e. as employees of a state-run psychiatric institution) and as such had to carry out the policies and directives of their supervisors and superiors.

Obedience to authority clearly loomed large in the overall assessment of the guilt of these nurses. What has not been given the same attention is the fact that the nurses also offered ethical reasons for their involvement in 'euthanasia'. This may or may not have helped their case when they were tried. However, their arguments merit critical attention both as history and to the extent to which they highlight challenges in nursing ethics today.

First and foremost, the notion of obedience to proper authority was a deeply ethically grounded concept that was emphasized in both the culture of Nazi Germany as well as in nursing education of that era. The nurses were not automatons. They believed in the moral propriety of the system in which they worked. The moral legitimacy of the orders they received and the impact of those orders was that they deserved or merited obedience, given that their source was doctors and their context a psychiatric hospital run by the state. Some of the nurses put their moral duty to obey proper orders ahead of their moral duty not to kill. Others believed that what they did was not killing but merely the outcome of obeying a morally licit command.

It is sometimes argued that the only way to understand the actions of doctors and nurses involved in 'euthanasia' and murder in Nazi Germany is in psychological terms. The participants were so stressed and brainwashed to do their duty and follow orders that their conduct falls outside the realm of being morally motivated.[28,29]

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

The testimony of the nurse defendants of Obrawalde is a telling reminder that people rarely involve themselves in highly emotional and stressful behaviors unless they believe they are doing the right thing.[30] It is obvious from the testimony that some of the nurses did believe that the killing they engaged in was ethical; or else, having the benefit of 20 years to reflect on their actions, they had arrived at a state of remembrance with which they could comfortably justify their involvement.

Many of the nurses also expressed the belief that 'euthanasia' was justified for people who were terminally ill, hopeless and doomed to die. They argued that it was ethical to hasten the death of those who would die anyway, perhaps after much suffering and pain. In addition to feeling comfortable with committing acts that merely hastened the inevitable, the belief that they were relieving both physical and mental suffering supplied a moral basis for killing. Euthanasia became a sort of ultimate therapy and the only recourse available to relieve the pain and suffering that otherwise would have gone on unceasingly. Whether in fact the patients who were killed were suffering is highly dubious. The descriptions given of many of the patients' actual suffering does not square with the ethical rationale the nurses offered. Yet, it is clear that the moral importance of relieving suffering played a key role in allowing the nurses to square their religious and personal views against killing with the killing of their psychiatric patients.

The notion that euthanasia was a form of therapy is manifest in the emphasis placed in many of the testimonies on the fact that the physicians selected particular patients for death. The notion of a diagnosis that merited death is consistent with the view that killing could be seen as a form of medical therapy for the patients of Obrawalde, and thus consistent with nursing ethics at that time and under those circumstances.

It is important to note that many of the nurses involved in the killing of selected patients were very concerned to point out that they had acted with care and compassion. They calmed the restless and reassured the skeptical, and promised to honor the requests made by the doomed. The association of the virtues of the nursing profession with their actions is yet another way in which it is clear that those involved in the killings had to feel a level of ethical comfort with their roles and behavior in order to engage in 'euthanasia'.

It is sometimes difficult to reconcile a commitment to ethics with actions that are on the face of it immoral and heinous. However, the fact remains that those who engage in corrupt and shocking actions in the name of health care must convince themselves of the moral propriety of what they are doing: a lesson it is important never to forget.[29]

## Conclusion

Contemporary events necessitate a keen awareness of these acts of the fairly recent past. During this time, nurses largely ignored any personal qualms they had about the evil perpetrated on their patients in favor of government policy. We read of military personnel, including nurses, who ignored signs of torture of prisoners at the Abu Ghraib prison in Iraq and who were complicit in torture and other illegal acts in Afganistan and Guantánamo Bay, Cuba.[31] This is a contemporary example of nurses either ignoring their personal ethics or relinquishing it for the facilitation of a government's policy. Situations in which those in authority not only permit but even encourage or orchestrate abuse are, according to Robert J Lifton, 'atrocity-producing

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007.
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

situations' (p. 416).[31] This was the case at Meseritz-Obrawalde, just as it was (or is) in Iraq. Knowledge of what has happened in the past when government policy overruled individual conscience is essential to prevent it from becoming accepted policy again.

## Acknowledgements

This study was funded by a grant from the National Library of Medicine, National Institutes of Health (1R01LM06653–01A1, S. Benedict, PI) and a fellowship for Research on Medical Ethics and the Holocaust (S Benedict) by the Research Institute of the United States Holocaust Memorial Museum funded by the Merck Company Foundation.

*Susan Benedict, Medical University of South Carolina, Charleston, SC, USA.*
*Arthur Caplan, University of Pennsylvania, Philadelphia, PA, USA.*
*Traute Lafrenz Page, Yonges Island, SC, USA.*

## References

1  Trial of Hans-Joachim Becker and Friedrich Robert Lorent, Ks 1/69 (GStA), 27 May 1970, Landgericht Frankfurt: 721. File location: Documentation Centre of Austrian Resistance (DÖW), Vienna (in German).
2  Friedlander, H. *The origins of Nazi genocide.* Chapel Hill, NC: University of North Carolina Press, 1995: 151.
3  Burleigh, M. *Death and deliverance.* Cambridge: Cambridge University Press, 1995: 149.
4  Dramowicz, Waldemar. *Obrzyce, Międzyrzecz.* 2004 [A history of Meseritz-Obrawalde: no other details available] (in Polish).
5  Sagel-Grande I, Fuchs H, Rüter, C. *Heil- und Pflegeanstalt Meseritz-Obrawalde; Justiz und NS-Verbrechen.* (*Care and nursing institution Meseritz-Obrawalde; Justice and National Socialist Criminal Records.*) Vol. XX, 1979. Amsterdam: University Press Amsterdam, 1979: 700 (in German).
6  Statement of Hilde Wernicke, Landesgericht, Berlin, December 7, 1945. File location: Jerusalem, Yad Vashem, file number TR 10/2584 (in German).
7  Ebbinghaus A. *Opfer und Täterinnen. (Sacrifice and perpetrator.)* Nördlingen: Delphi Poiliti, 1987: 224 (in German).
8  Statement of Hilde Wernicke, Landesgericht, Berlin, December 7, 1945. File location: Jerusalem, Yad Vashem, file number TR 10/2584 (in German).
9  Statement of Luise E, Wasserburg, Germany, 19 June 1961. File location: Staatsarchiv München, file number 33.029/2 (in German).
10  Statement of Otto Freund, 4 December 1964, Landesgericht, Frankfurt. File location: Staatsarchiv München, file number 33.029/3 (in German).
11  Statement of Hedwig Vollheim, 10 February 1960, Bavarian Criminal Police, Munich. File location: Staatsarchiv München, file number 33.029/1 (in German).
12  de Mildt D. *In the name of the people: perpetrators of genocide in the reflection of their post-war prosecution in West Germany.* The Hague: Martinus Nijhoff, 1996: 65.
13  Memorial Chamber at Obrzyce, 2005.
14  The Criminal Case Against Hilde Wernicke and Helene Wieczorek, 24 August 1946. File location: Staatsarchiv München, file number 33/029/1 (in German).
15  Arendt H. Introduction. In: Naumann B. *Auschwitz.* New York: Praeger, 1966: xi.
16  Letter to the court from Merkenschlager K, 1 March 1965. File location: Staatsarchiv München, file number 33.029/7 (in German).

Downloaded from http://nej.sagepub.com at CALIFORNIA DIGITAL LIBRARY on December 3, 2007
© 2007 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.





State of
California
Department of
Consumer
Affairs

# BOARD OF VOCATIONAL NURSING
# AND PSYCHIATRIC TECHNICIANS
2535 CAPITOL OAKS DRIVE, SUITE 205
SACRAMENTO, CALIFORNIA 95833-2945
TELEPHONE (916) 263-7800; FAX (916) 263-7859
INTERNET ADDRESS: http://www.bvnpt.ca.gov



March 23, 2007

Selene F. Stewart, LVN
3189 Garrity Way
San Pablo, CA 94802

RE: Case No. 06-122

Dear Ms. Stewart:

The Board of Vocational Nursing and Psychiatric Technicians (Board) completed its investigation into the complaint filed against you alleging that you refused to give a Hospice Patient medications.

The Board was not able to substantiate the allegations to the level of clear and convincing evidence needed to proceed with administrative action. Therefore, the case was closed.

Thank you for cooperating with the Board in this matter. Please contact me at (916) 263-7865 should you have questions regarding the above information.

Sincerely,

**AMY WYCKOFF**
Enforcement Analyst

AW deB

E OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                              *Arnold Schwarzenegger, Governor*



State of
California
Department of

Consumer
Affairs

# BOARD OF VOCATIONAL NURSING
# AND PSYCHIATRIC TECHNICIANS
### 2535 CAPITOL OAKS DRIVE, SUITE 205
### SACRAMENTO, CALIFORNIA 95833-2945
### TELEPHONE (916) 263-7800; FAX (916) 263-7855
### INTERNET ADDRESS: http://www.bvnpt.ca.gov

November 20, 2006                                    VN 11364

Selene Stewart, LVN
244 Clearpointe Dr.
Vallejo, CA 94591

Dear Ms. Stewart:

The Board of Vocational Nursing and Psychiatric Technicians (Board) received a complaint alleging that you refused to administer pain and other medications to a patient; that you were uncooperative with Hospice; and that the patient allegedly expired while in route to Hospice.

These allegations are very serious. The Business and Professions Code Sections 2878(a) and 2878(a) (4) give the Board authority to suspend or revoke your license for unprofessional conduct and excessive force, mistreatment or abuse of any patient.

Submit to the Board a detailed description of the circumstances surrounding the above allegation and documentation supporting your statement. **Please respond to this request no later than 30 days from the above date.**

Additionally, Board records indicate that your fingerprints are not on file. **Therefore, you must submit your fingerprints within 30 days from the date of this letter.** Enclosed is a "Request for Live Scan Service" form. Please follow the instructions for completing the form. Live Scan sites are located at most Police and Sheriff Stations, Offices of the Department of Justice and some large school districts.

If you have any questions, please feel free to contact the Board at 263-7828.

Sincerely,

**GINA SHELLHAMMER**
Enforcement Analyst
Attachments
GS: tbj

California - Health and Human Ser_____ Agency

1424 NOTICE

CN NUMBER:   11-1685-0003554-S

Department of Health Services

Page 1 of 6

Date: 12/28/2006 Time: 1500

YOU ARE HEREBY FOUND IN VIOLATION OF APPLICABLE
CALIFORNIA STATUTES AND REGULATIONS OR APPLICABLE
FEDERAL STATUTES AND REGULATIONS

Type of Visit : Complaint Investig.
Incident/Complaint No.(s) : CA00086098

| | |
|---|---|
| Licensee Name: | Nadhan, Inc. |
| Address: | 161 SMITH ROAD   ALAMO, CA 94507 |
| License Number: | 110000087   Type of Ownership:   Profit Corp |

| | |
|---|---|
| Facility Name: | WINSOR HOUSE CONVALESCENT HOSPITAL |
| Address: | 101 S ORCHARD AVE   VACAVILLE, CA 95688 |
| Telephone: | (707) 448-6458 |
| Facility Type: | Skilled Nursing Facility |
| Facility ID: | 110000084 |

Capacity: 87

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS | PENALTY ASSESSMENT $20,000.00 | DEADLINE FOR COMPLIANCE 1/9/07  6:00 a.m. |
|---|---|---|---|
| 72313(a)(2) | **CLASS A   CITATION – C,M** | | |

*[Handwritten left margin: The Director of Nurses had an inservice and advised the nurses that three nurses were arrested in one week for not giving medications exactly and the hospital had to bail them out!]*

**CLASS A   CITATION – C,M**

72313(a) Nursing Service-Administration of Medication
(a) Medications and treatments shall be administered as follows:

72313(a)(2) Nursing Service-Administration of Medication
(a) Medications and treatments shall be administered as follows:
(2) Medications and treatments shall be administered as prescribed.

The facility violated the regulation by failing to administer medications as prescribed for a hospice resident, who was dying, resulting in a resident experiencing pain and suffering, exhibited by "agitation, irregular and labored respirations, sounded congested, and was minimally responsive".

Resident 1 was a 63 year old male admitted on 6/27/06 for skilled nursing care and services. Resident 1's diagnoses included end stage renal disease requiring hemodialysis three times a week, cardiomyopathy, and chronic obstructive pulmonary disease. The Minimum Data Set (MDS) assessment dated 6/27/06 documented no long term or short term memory problems or cognitive impairment. The MDS documented that Resident 1 had edema and shortness of breath requiring oxygen therapy. The MDS did not indicate the frequency, the intensity or the location of Resident 1's pain.

A care directive titled, "RESIDENT or RESPONSIBLE PARTY WISHES FOR

| Name of Evaluator: | Without admitting guilt, I hereby acknowledge receipt of this SECTION 1424 NOTICE |
|---|---|
| BARBARA EBERT HFEN | Signature : _____ |
| | Name : Theresa White |
| Evaluator Signature _____ HEB | Title : Admin. |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT
VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

California - Health and Human Services Agency

Department of Health Services

424 NOTICE

Page 2 of 6

NUMBER:    11-1685-0003554-S

Date: 12/28/2006 Time: 1500

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| *(handwritten marginalia)* | MEDICAL CARE" dated 6/27/06, documented "resident [named] request the following care in the event that the attending physician determines that resident's [named] condition (Be it injury, disease, or illness) is terminal, incurable and irreversible, and that death is imminent... Administration of medications other than those necessary to prevent infection, provide comfort or alleviate pain" was marked "yes" and the directive of care was signed by Resident 1 on 6/27/06.

Nurses notes dated 7/6/06  2:45 p.m., documented that Resident 1 did not feel well and refused to go to dialysis.

On 7/19/06 at 9:30 a.m., Licensed Nurse X stated that on 7/6/06 at 1:20 p.m. and 3:45 p.m., Resident 1 refused dialysis and the family was informed.  Resident 1 told the nurse that he hurt all over.  Licensed Nurse X obtained pain medication and started Resident 1 on 0.25 cc or 5 mg. of Roxanol 20 mg/1 cc concentration (Roxanol is a brand name for Morphine Sulfate) by mouth every 2 hours as necessary (prn) for pain, and Licensed Nurse X stated that Resident 1's pain was relieved by the Roxanol. The same day, 7/6/06 at 3:45 p.m., the physician's order was changed to every (1) hour as necessary and not to hold for a change in respirations. Licensed Nurse X stated that the orders were changed because the facility and medical staff determined that Resident 1 would have more pain because Resident 1 was not receiving dialysis.

The Nurse Practitioner referred Resident 1 on 7/6/06 4:35 p.m., to hospice and changed the physician's order to: 1) Morphine Sulfate 0.5 cc by mouth or under the tongue every (1) hour for moderate pain or shortness of breath prn; 2) Morphine Sulfate 1cc by mouth or under the tongue every (1) hour for severe pain or shortness of breath prn; 3) Morphine Sulfate 2 cc by mouth or under the tongue for pain not relieved by 1 cc every (1) hour prn; 4) Morphine Sulfate 3 cc by mouth or under the tongue for pain not relieved by 2 cc every (1) hour prn.

The hospice nurse changed the physician's orders on 7/7/06 at 11:30 a.m., and wrote that licensed staff were to administer Roxanol .0.25 milligrams (mg.) from a 20 mg./1 cc concentration by mouth every 4 hours prn for pain or anxiety prn and Ativan 1 mg. by mouth every 4 hours prn for anxiety or discomfort.

Resident 1's nursing plan of care dated 7/7/06 for alteration in comfort due to pain documented the following approaches:  1) Assess location, frequency, intensity and character of pain; 2) Assess goals re: comfort; 3) Provide medication for pain per physician's order; 4) Call Hospice for any changes.  The goal was that Resident |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT
VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| *Nurse A was an RN per India and was supervisor 2 manager. He was on the esk with no tients. She has never returned India* | comfort, as determined by Resident 1 would be maximized and maintained.

A declaration dated 8/12/06 at 8:30 p.m., from the hospice nurse, who was on duty on 7/8/06 documented the following: "At approximately 10:30 a.m., the morning of 7/8/06, while visiting another patient, I received a call from the answering service that Licensed Nurse A [named] at the skilled nursing facility [named] wanted to speak with me regarding Resident 1 [named]. I called Licensed Nurse A [named] immediately upon receiving that message...she then reported to me that the family was concerned that the patient was not receiving his medication for pain control. I asked her what the hospice nurse [named] had written on admission. She reported that the hospice nurse [named] had written orders for Morphine Sulfate prn-I believe the order was for Morphine Sulfate (Roxanol) 20 mg./ml. by mouth every 2 hours prn. I told her to make the order routine then as follows: Morphine Sulfate 20 mg./ml., 0.5 ml. by mouth every four hours around the clock, and Morphine Sulfate 20 mg./ml. by mouth every two hours prn breakthrough pain. This is a pretty standard, non acute, morphine order. I also ordered Ativan 1 mg. tablet by mouth every 4 hours around the clock. This also pretty standard, non acute...I did not receive another call from the facility [named] until approximately 3:45 p.m. when the answering service called me and reported that Licensed Nurse A at the facility [named] needed to speak to me right away about Resident 1 [named]. Licensed Nurse A said Resident 1 [named] is bleeding, he's covered in blood...she thought he was bleeding from the rectum...I was approximately a 20 minute drive away...I would leave for facility [named] right away...Resident 1 [named] was pale, his respirations were irregular and labored and though he was minimally responsive, he appeared agitated. He could not answer any questions, he could not speak. Resident 1's sister was crying...that the nurse had given him a white pill under his tongue at 4:00 p.m., but she (sister) had been asking for morphine for him and the nurse had not given him any...I walked up to Licensed Nurse B [named] and introduced myself and asked her if she had medicated Resident 1 [named] as I had ordered. She stared at me without replying. I asked her again what she gave Resident 1 [named] at 4:00 p.m...She said-an Ativan. I asked her if she gave him 0.5 ml of Morphine as ordered. She said-No, How can I? How can I go in that room? They're all in there? What am I supposed to do? I said-You're supposed to give him the Morphine! I walked back to Licensed Nurse A [named] and asked her did you pass on my verbal order for meds? Licensed Nurse A [named] shook her head yes. I returned to Licensed Nurse B [named] and said, do you understand that I gave a verbal order for routine medication for this patient-this a doctor's order-you are required to give him the medication. Licensed Nurse [named] just looked at me and did not reply...I asked the three people in the room how long they had been there-the sister said she had |

*There was severe 1 MD's attending SC. Patients there AND there was an MD in the building. I took him into the patient's room and he stated "Just clean him and make him comfortable since he is hospice. He is reluctant to come forward.*

*I was in the room at least 15 times ref req.*

*I was in the room at least 15 times ref req.*

*There was an Ativan given before. Statement see below.*

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

*1) The patient was supposed to be in Dirdgers at 11PM he had missed all week. The supervisor RN had not arranged transportation. The respite RN did nothing stating the family and not want to pay. She stated that the MD might order it discontinued. There were people including his sister who he fell, they never 1130 til 1945. There people including his sister who were really instead of taking him there.*

e of California - Health and Human Services Agency

CTION 1424 NOTICE

CITATION NUMBER:    11-1685-0003554-S

epartment of Health Services

Page 4 of 6

Date: 12/28/2006  Time: 1500

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| *The hospice RN had a contact with the family. The hospice RN was present at 5 PM. I asked the hospice nurse why she said even though the patient was not present she told another RN on the way to give revel some. The hospice nurse was present and on RN's notes duties of the Patient important because of ...* | been there all day. I asked if Licensed Nurse B [named] had medicated Resident 1 [named]. All three people present said no and added that he had been uncomfortable/agitated all day and they had been asking for pain medication for him but nothing had been given...I told Licensed Nurse B [named] I would medicated him myself. She looked at me for a moment, then gave me the bottle [Morphine]. Over the next 20 minutes, I gave Resident 1 [named] 1 ml. (20 mg.) of Morphine. After 20-30 minutes or so, he seemed very comfortable."

During an interview on 9/18/06 at 3:06 p.m., the Hospice Nurse stated that she administered the Roxanon on 7/8/06 at 4:45 p.m.

Review of the nurse notes dated 7/8/06 at 2:00 p.m., revealed that Licensed Nurse B told the family the following: "I explained that my order [Morphine and Ativan] was only to be given @ [at] the request of the patient."

A declaration from Resident 1's family member dated 8/28/06 at 9:20 p.m., documented the following: "I called Licensed Nurse B at facility [named] at or about 4:00 p.m., on July 8, 2006 to ask her how my father was doing. Licensed Nurse B [named] stated she did not administer medication to my father because my father had to ask for it himself. I told her to give him his medication he is on hospice and he had not had dialysis in 4 days he was going to be in pain. Licensed Nurse B [named] said she would not give medication unless my father asked for it...At or about 5:00 p.m...on July 8, 2006, I went to my fathers room he was breathing *The hospice RN* extremely deep would stop breathing and start again he did not seem to be *was there at 5 PM.* comfortable he was very congested he sounded to be full of fluid. I tried to speak to my father he was no [not] (sic) coherent at all he would not respond to my talking to him. I said my good bye to my father and had to leave due to strong feelings about my fathers distress through out the entire day."

Review of Resident 1's medication administration record for the month of July 2006 revealed that there was no Roxanol administered on 7/8/06 until the Hospice Nurse came to the skilled nursing facility on 7/8/06 after 4:00 p.m., and this was confirmed by Licensed Nurse B's nurse's notes. In addition, Licensed Nurse B did not give the Ativan that was ordered around the clock for agitation. On 9/15/06 at 10:30 a.m., Licensed Nurse B stated she was unsure if Resident 1 took the Ativan tablet. Licensed Nurse A did not time the physician's verbal order relayed by the hospice nurse for the Ativan or Roxanol for around the clock nor the Roxanol for breakthrough pain as ordered on 7/8/06 at 10:30 a.m., by the Hospice Nurse. |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

of California - Health and Human Sen—···s Agency        ⎯⎯apartment of Health Services

⎯TION 1424 NOTICE           Page 5 of 6

⎯ITATION NUMBER:     11-1685-0003554-S       Date: 12/28/2006 Time: 1500

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| *Was this a New verbal Refusal?* | On 9/15/06 at 10:30 a.m., Licensed Nurse B when asked why she did not give the around the clock Morphine and Ativan order as prescribed. Licensed Nurse B stated that she did not know about the order and stated it was not on the medication administration record. Licensed Nurse B when asked why her signatures were on the medication record if she did not have knowledge of the order. Licensed Nurse B stated that Resident 1 was refusing the medication. Licensed Nurse B was asked what does she do when a resident, who is on hospice refuses medication? Licensed Nurse B stated that "I document it in the nurses notes" and she notifies the hospice nurse or the physician. Licensed Nurse B when asked why had she not notified the Hospice Nurse about Resident 1 refusing his Roxanol and Ativan, replied, "I had a lot going on that day." Licensed Nurse B when asked if she reviewed Resident 1's nursing plan of care for alteration in pain, stated, "No",and added that she looks at the nursing plan of care only when "there's something specific".

On 9/15/06 at 1:45 p.m., the Hospice Nurse stated that on 7/8/06, she was never informed that Resident 1 refused his Roxanol and Ativan or she would have come in immediately to provide an assessment. The Hospice Nurse stated that on 7/8/06 at 4:00 p.m., Resident 1's face was scrunched up, he was wiggling around in bed, grimacing, and offered no response to questions. The Hospice Nurse stated that Resident 1 did not refuse his Roxanol at 4:45 p.m. and his pain was relieved.

During an interview on 12/8/06 at 12:00 noon, the Hospice Medical Director stated that he was aware of the around the clock order later in the day and that he "backed those orders". The Hospice Medical Director stated that the Hospice Nurse was concerned about managing Resident 1's pain and about the behaviors of Licensed Nurse B. The Medical Director stated that he recommended transferring Resident 1 by ambulance to the emergency room at the local acute care hospital. The Hospice Medical Director stated, "I wanted to [pause] him to get the hell out of of there because I was concerned about the patient's safety." *Where was the transfer order. ER was 6 min. away!*

The facility's policy and procedure (no date) titled, "Pain Assessment Policy" documented, that the "Purpose: To improve or maintain the quality of life for facility residents by properly assessing their level of pain, providing adequate intervention to manage the pain and then evaluating its effectiveness... It is the policy of this facility to ensure that residents have routine assessments for pain and receive adequate management of that pain...5. Pain medications will be administered according to the physician's order." |

*Extremely Irresponsible!*

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

.ate of California - Health and Human Ser— —s Agency

—: —epartment of Health Services

**SECTION 1424 NOTICE**

Page 6 of 6

**CITATION NUMBER:**    11-1685-0003554-S

Date: 12/28/2006  Time: 1500

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| The pchents daughter in law Werked at the hospital then and still dees work there Now she claims Now that the patient was not hospice. Also I heard her the chart was purged of critical events. The family has no criminal history. | The facility violated the regulation by failing to administer medications as prescribed for Resident 1, which resulted in Resident 1 experienced unnecessary pain and suffering exhibited by "agitation, irregular and labored respirations, sounded congested, and was minimally responsive".

The violation presented either imminent danger that death or serious harm would result or a substantial probability that death or serious physical harm would result. |

For a criminal history. I did not look into hers, since

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT**    she is scared to
**VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**    be a victim of
Abuse.